JAMES L. TARPLEY *et al.*, plaintiffs in error, *vs.* ROBERT L. McWHORTER, guardian, defendant in error.

1. Prior to January 1, 1863, when the Code went into effect, a guardian had the legal authority to loan the funds of his ward to solvent persons, and under the act of April 18th, 1863, he could lawfully receive Confederate interest-bearing notes in payment thereof.

2. Under the act of December 11th, 1862, a guardian had power to appoint an agent to act for him in his absence in the Confederate army, and any act of the agent within the scope of his authority would be as valid as that of the guardian.

3. Where all the parties to the payment of notes belonging to the ward, well knew that the notes belonged to the ward, and that the title to the notes was in the absent guardian, legal possession alone of the notes is not conclusive of the agency of the holder of them, so as to discharge the makers and relieve the guardian of liability.

4. The guardian, in a contest between the heirs of a lunatic and himself touching his administration of the ward's estate, is a competent witness, the heirs being in life and also witnesses in the case.

Guardian and ward. Principal and agent. Promissory notes. Witness. Before Judge GIBSON. Greene Superior Court. September Adjourned Term, 1875.

Reported in the opinion.

A. G. & F. C. FOSTER; J. A. BILLUPS, for plaintiffs in error.

REESE & REESE; P. G. ROBINSON, for defendant.

JACKSON, Judge.

This was a bill brought by one Broughton, a lunatic, in his lifetime, against McWhorter, his guardian. Pending the litigation the lunatic ward died, and his next of kin and heirs were made parties. The bill is now proceeding in their names. They seek to make McWhorter account for the estate of the ward in his hands. He accounted for that estate by showing that while in the Confederate service he left certain notes on his brothers in the hands of one Caldwell, his general agent, with instructions to do the best he could with them under the law and in the interest of his ward. These notes were all the estate, except negroes, which were freed, and whose hire had been expended for the support of the ward. During McWhorter's absence his brothers paid the notes to Caldwell in Confederate interest-bearing notes, and the same notes were produced. The payment was made in the winter of 1863–4, probably in December, 1863, from the best light thrown on the transaction. The main question in the case is, was this payment to Caldwell, the agent of Mc-

Whorter, a legal payment, and is McWhorter thereby discharged ?

1. The act of April, 1863, fully authorized McWhorter if he had been at home, to receive the Confederate interest-bearing notes; that question was ruled by this court at the last term, and had been ruled substantially, often before.

2. The question then is, did his agent receive this money, and was he authorized to do so ? This bill calls for discovery, and responding to it, the defendant says that he left the notes in question with Caldwell, with directions to do what he could with them for the best interest of the ward; and that on his return he found that payment had been made of them. If the custody of the notes was committed to Caldwell with this instruction, Caldwell was the agent of McWhorter in respect to these notes, and was, as such agent, authorized to receive payment. See act 11th December, 1862, and act of 18th April, 1863; pamphlet laws of Georgia, 1862–3, pages 29, 143. But McWhorter swore on his oral examination before the jury, that Caldwell was not authorized to do any act for him as guardian, and there appears to be a seeming inconsistency in the two statements. It is possible that he meant that Caldwell was not authorized to make returns or act as guardian in business of that sort, but not that he was not to collect, or to treat these notes to the best advantage for him; for otherwise the answer sworn to cannot be reconciled with the sworn testimony on the stand. Mrs. McWhorter in her testimony, swears of Caldwell as the agent of her husband. J. H. McWhorter swears that he paid the money to Caldwell, agent of defendant, and that "Miles Caldwell was appointed general agent of defendant in his (my) presence to transact all of his business of any and all kinds during his absence in the army." Miles Caldwell swore that he "did all kinds of business for him, defendant, as a general agent," and "collected money from W. H. and J. H. McWhorter in the latter part of 1863 or first of 1864." This is the entire evidence in respect to this agency. On this question, the court charged as follows: "If respondent in good

faith, through himself or agent, received the money in ac-
cordance with a then law of the state, and the money now
produced is the very money received in payment of the notes
held by him or his agent, then he is not liable to complain-
ants for said sum." Again, at request of complainants' coun-
sel, the court charged "that if Miles Caldwell was general
agent of defendant, for the transaction of his business during
the war, but was not specially authorized by defendant to act
as his agent in transacting the business of the trust estate, and
received Confederate money in payment of notes held by de-
fendant as trustee or guardian, said Caldwell acted without
authority, and his receiving that Confederate money is not
binding upon the complainants and does not relieve defendant
from liability;" to which he added, "the legal holder of a
negotiable paper or note, or other evidence of debt due a trus-
tee or guardian, is the legal and lawful agent of such trustee
or guardian, and can collect and receive payment thereof with-
out any authority of the guardian. Any person making pay-
ment to a legal holder of a negotiable note is discharged by
such payment, and no special authority is necessary for such
payment."

3. The latter part of this charge, under the facts of this
case and the circumstances surrounding this transaction, we
consider erroneous. All these parties knew, they must have
known, that the notes were the property of this ward, and be-
longed to the guardian as trustee. The mere fact that anybody
held them would hardly, we think, make such holder a proper
party to receive the money as agent, without more. If the
makers of these notes found them in possession of some hold-
er in whom they thought the title was and paid them, it would
have discharged them; but when they sought these notes in
the hands of McWhorter's wife, or his overseer, and knew
that the title was in him as the guardian of this lunatic, before
payment to the wife or overseer could discharge them, they
should have been assured that the wife or overseer was Mc-
Whorter's agent to receive the money. While the possession
of the notes would strengthen the idea that Caldwell was

agent in this matter, apparently controlling them as such, yet that fact *alone* is by no means concluside of his agency. Yet such was the substance and effect of the charge. This charge may have controlled the case. It may have drawn the minds of the jury from the true issue, which was this: did these parties understand that Caldwell was agent to receive this money? and with that understanding, did they pay it to him? Was he appointed to do this business? Did his general agency extend to this transaction, and did the makers of the notes in good faith pay them with that understanding? If so, McWhorter could not have recovered from the makers on his return from the army, and would not be responsible himself. He must have left the notes in Georgia, and if he left them with Caldwell, as his answer asserts, to do the best he could in respect to them, and they, the makers, found them in Caldwell's hands, and understanding him to be the agent of the guardian, paid what Caldwell, as agent, was authorized by law to receive, then the guardian could not have recovered the money so paid by them from them, and having acted in good faith himself, would be discharged from all liability. But if the makers took advantage of the absence of the guardian, who swore that he would not have received the money if present, to pay in a depreciated currency these notes to an illiterate general agent who had no authority to act in this particular transaction; if this transaction was an expedient to get rid of this debt due to this lunatic at a sacrifice, the money having been loaned to them when good as gold, there being no agent empowered to receive it, then it would not discharge the guardian unless subsequently ratified by him in good faith. The guardian had a discretion under the act of April 18, 1863, to receive this money or not. The language of the act is, "it shall be lawful," etc., to receive the Confederate money; not that a trustee must receive it. This discretion could be transmitted to an agent under the act of 11th December, 1862, and such agent for such business could also receive the money and deliver up the notes, the discretion being transferred by appointment to him; so that the question, in our view of the

law applicable to the facts here, is narrowed to the issue, was Caldwell such an agent, entrusted with these notes for this purpose to do the best he could with them, to represent Mc-Whorter in respect to them, and did he, *bonà fide*, so represent McWhorter, and these debtors so pay the notes. On this issue we incline to think the evidence preponderates that he was such an agent, and but for the testimony of the guardian himself, on the stand, apparently in opposition to his statement in his sworn answer, notwithstanding the error of the court, as we think, in the addendum to the request of complainants' to charge, we should not have sent the case back. On his own evidence, out of his own mouth, the jury may have convicted him but for this charge; and therefore we think they had better again pass upon the issue of agency or no agency *for this business.* If the jury should find that Caldwell was not the agent for this purpose, and these makers of the notes paid them to him wrongfully, then the question will arise did McWhorter ratify, on his return home, and will that protect him? The answer to this question turns, we think, on *bona fides* and diligence. What would a prudent man of business have done with his own notes in such a case? Would he have sought to recover them, or would he have let the money go? Returning and finding the notes paid and gone—in the pockets of the makers—would a prudent man of business, such a transaction having occurred in reference to his own paper left like these notes were, have sued the makers and sought to recover, or would he have let the matter rest just where he found it? Considering the debtors on the paper strangers and not related closely to McWhorter, what would he, as a prudent man of business, have done with his own notes so paid in his absence? Would he have risked more money after these debts, or taking all the chances of recovery and the expenses and trouble of litigation, would he have let it alone? If, on his return, he acted with the diligence of a prudent man of business and in good faith, in declining to press the matter upon these debtors, though the agent had not been entrusted specifi-

cally with the notes, and though, had he been present, he would not have taken the money, then his ratification and acquiescence would protect him ; but if he failed to display such diligence, and did not act in good faith in such acquiescence, then he would be bound for the debts. As the best we can do, in the light shed upon the case by the law and facts, as we understand them, we send the case back on these two issues: the agency of Caldwell to transact this business for McWhorter, as explained above, and if not the agent, then the good faith and diligence of McWhorter, as explained above, on his return. Let the jury pass upon these two questions.

As heretofore ruled, the proper practice is not to read the requests to the jury if the court means to decline to give them.

4. We think McWhorter was a competent witness, and as he was on the stand and could verify his account, we see no objection to his receipt to himself going in, his account being thus proven on the stand. We see no error in the refusal to charge in respect to the acts of the legislature, as requested, and in charging as he did thereon; nor do we see error in the views of the court touching section 2330 of the Code. That section cannot apply to this case; the money was loaned before it became law. Nor do we think he erred in holding that the guardian, before January, 1863, had the right to loan to solvent persons, and after April, 1863, had the right to receive it back in Confederate funds under the act of April 18th, 1863. So of all the other numerous assignments of error. This case has been twice tried. It was here before, and then it was ruled that the defendant must show affirmitively that this very money was received by him in good faith: 53 *Georgia Reports,* 291; and it was sent back on that point. Now we send it back, with regret, on the issues of agency and ratification, because two juries have passed upon the case. The single error which forces us to do so, is the addendum of the court to the request of complainants, which, we think, might have misled the jury and drawn them away from the true issue. We sincerely hope that it may be so given to the jury on the

next trial, as not to require any further discussion of it, either in the court below or here.    We have felt it our duty to administer to complainants in this case, the extreme measure of their legal rights, because transactions between brothers and the estate of a lunatic ward are involved; and notwithstanding the verdict of two juries under the rulings of two judges, we give them therefore one more hearing on the issues hereinbefore explained.

Judgment reversed.